**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

CHRISTOPHER WHITEHILL,                 )
KIM HERB,                              )
ERIC HERB,                             )
LAURIE JACOBS,                         )
DAVID JACOBS,                          )    Case No: _____
JARED MARTINEZ,                        )
SHELLY RICHARDSON,                     )    **JURY TRIAL DEMANDED**
LOUIS RICHARDSON,                      )
MICHAEL GILLIS,                        )
LILY FAIRCHILD,                        )
JOEL HARRY,                            )
DEBORAH HARRY,                         )
ROBERT BALDAUFF,                       )
SHELLEY BALDAUFF,                      )
MICHAEL J. KEY,                        )
LIZ TORRES,                            )
ADAM MACKE,                            )
SCHUYLER JOSEPH VREEMAN,               )
BRANDON ANDERSON,                      )
JENICA ANDERSON,                       )
CHARLES GIBSON,                        )
GARY VINOVICH,                         )
DAN MERCER,                            )
ROGER S. APPLEWHITE,                   )
HEDIEH POURNIK,                        )
KURT WITHERS,                          )
LINETE APARICIO-CHAGOLLA,              )
ADAM CHENEY,                           )
                                       )
Individually and on behalf of themselves )
and all those similarly situated,      )
                                       )
                 Plaintiffs,           )
                                       )
v.                                     )
                                       )
ATLANTIC BUILDING SYSTEMS, LLC         )
d/b/a ARMSTRONG STEEL                  )
CORPORATION,                           )
                                       )
**Serve Registered Agent:**           )
7700 E. Arapahoe Rd. Ste. 220,         )
Centennial, CO 80112                   )

1

```
                              )
      Defendant.              )
                             )
                             )
                             )
```

## PLAINTIFFS' CLASS ACTION COMPLAINT

Plaintiffs, by and through their undersigned counsel, Jack McInnes of McInnes Law LLC and A. Scott Waddell of the Waddell Law Firm LLC, state and allege as follows:

### INTRODUCTION

1.      This case involves Atlantic Building Systems, LLC d/b/a Armstrong Steel Corporation ("Armstrong Steel" or "Defendant") systemic and consistent false marketing and selling of "Metal Building System(s)" to consumers throughout America without the ability to properly meet the demand and orders for same beginning in 2020 and continuing today.

2.      On information and belief, Defendant systemically, consistently and falsely represented and marketed that Armstrong Steel was "currently delivering buildings in about 120 days from purchase" when said representations were patently false.

3.      On information and belief, Defendant systemically, consistently and falsely represented and marketed that Defendant would "take a 25% deposit to secure your pricing and tag the amount of steel used for your building in your name."

4.      As further part of this marketing and/or advertising scheme, Defendant continued to take sizeable deposits on these "Metal Building System(s)" without the ability to meet the significant demand for same.

5.      Defendant further systemically and consistently later demanded its customers pay significant, additional price increases before Defendant was willing to perform Defendant's portion of the contract and manufacture, supply and deliver the "Metal Building System(s)".

6.     When Defendant's customers' refused to pay the additional monies to Defendant and demanded their significant deposits back, Defendant systemically and consistently refused to return them.

7.     Interestingly, and on information and belief, Defendant was founded by Ethan Chumley.

8.     Ethan Chumley is a former employee of General Steel Corporation ("General Steel").[1]

9.     In 2007, General Steel Corporation agreed to pay $4.5 million to settle a consumer protection case brought by the Colorado Attorney General's Office.[2]

10.     Within that case, the Colorado Attorney General's Office alleged that General Steel carried out a deceptive sales and marketing plan, including that it falsely implied that it manufactured an inventory of buildings available at factory-direct or clearance prices, when no such buildings existed. *Id.*

11.     Further, General Steel agreed to continue to follow a previous injunction requiring more responsible sales practices. *Id.*

12.     Plaintiffs bring this Class Action Complaint on behalf of themselves and all those persons and/or entities similarly situated who paid deposits to Defendant for "Metal Building System(s)" but have still yet to receive same, and/or have been asked by Defendant to pay additional, significant sums to Defendant in order to have their original purchase order honored, and/or have had their requests for refunds refused by Defendant.

---

[1] https://www.forbes.com/sites/ericgoldman/2013/05/14/suing-over-keyword-advertising-is-a-bad-business-decision-for-trademark-owners/?sh=58e2c28c50a7

[2] https://www.denverpost.com/2007/03/13/ag-suthers-general-steel-settle-lawsuit/

## PARTIES

13.     Plaintiffs Kim and Eric Herb are citizens of California.

14.     Plaintiffs Laurie and David Jacobs, Jared Martinez, Shelly and Louis Richardson, and Joel and Deborah Harry are citizens of Colorado.

15.     Plaintiffs Robert and Shelley Baldauff, Michael Key, and Liz Torres are citizens of Florida.

16.     Plaintiff Adam Macke is a citizen of Idaho.

17.     Plaintiff Schuyler Joseph Vreeman is a citizen of Iowa.

18.     Plaintiffs Brandon and Jenica Anderson are citizens of Kentucky.

19.     Plaintiff Christopher Whitehill is a citizen of Missouri.

20.     Plaintiff Charles Gibson is a citizen of Michigan.

21.     Plaintiff Gary Vinovich is a citizen of Montana.

22.     Plaintiffs Dan Mercer and Roger S. Applewhite and Hedieh Pournik are citizens of Texas.

23.     Plaintiff Kurt Withers is a citizen of Utah.

24.     Plaintiffs Linete Aparacio-Chagolla and Adam Cheney are citizens of Washington.

25.     Defendant Atlantic Building Systems, LLC d/b/a Armstrong Steel Corporation ("Armstrong Steel" or "Defendant") is a limited liability company organized under Delaware law with its principal place of business in Colorado.

26.     Defendant may be served through its registered agent at 7700 E. Arapahoe Rd. Ste. 220, Centennial, CO 80112.

## JURISDICTION AND VENUE

27.     This Court has personal jurisdiction over Defendant because its principal place of business is in Colorado, it does significant business in Colorado, and on information and belief, the majority of all executive decisions were made in Colorado and the majority of the key witnesses would be in Colorado.

28.     Federal jurisdiction is appropriate under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class Member is a citizen of a State different from any Defendant, there are more than 100 Class Members, and the amount in controversy exceeds $5,000,000 exclusive of interest and costs.

29.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident of this district.

## ALLEGATIONS COMMON TO ALL COUNTS

30.     Defendant marketed its "Metal Building System(s)" nationwide, with promises to lock in prices and meet consumer demand.

31.     Defendant induced Plaintiffs to sign contracts as soon as possible, with the purported threat of looming price hikes for steel, by stating that their prices would be locked in.

32.     Defendant knew that it did not have the materials to meet the demand for its "Metal Building System(s)," yet it agreed to delivery times it knew it could not meet.

33.     In addition to late delivery, Defendant charged Plaintiffs additional amounts of money for their "Metal Building System(s)" before Defendant was willing to perform the contract, and refused to give refunds if Plaintiffs were unwilling to accept the price hike.

34.     Plaintiffs suffered delays and incurred costs as a result of these delays, such as money spent on projects that were never realized due to non-delivery of the "Metal Building System(s)."

## CALIFORNIA CITIZENS KIM HERB AND ERIC HERB

### KIM HERB AND ERIC HERB

35.     Plaintiffs Kim Herb and Eric Herb are citizens of Corona, California.

36.     Plaintiffs Kim Herb and Eric Herb allegedly locked in their steel price with Defendant on October 29, 2020.

37.     As part of that deal, Kim Herb and Eric Herb paid $24,657 to Defendant on April 12, 2021 and an additional $750.00 on April 13, 2021.

38.     On June 8, 2021, Defendant changed the Herb's contract from $100,630 to $202,254.

39.     Kim Herb and Eric Herb's building was supposed to first be delivered on July 1, 2021.

40.     When the first asked for their money back in 2021, Defendant's Vice President Kade Koenig screamed back "see you in court".

### COLORADO CITIZENS LAURIE JACOBS AND DAVID JACOBS, JARED MARTINEZ, SHELLY AND LOUIS RICHARDSON, AND JOEL AND KENDRA HARRY

### LAURIE JACOBS AND DAVID JACOBS

41.     Plaintiffs Laurie Jacobs and David Jacobs are citizens of Franktown, Colorado.

42.     David Jacobs first contracted with Defendant on July 14, 2021 and paid Defendant an initial deposit of $6,772.

43.     Upon Defendant's demand, Laurie Jacobs and David Jacobs paid Defendant an additional $5,912 on August 2, 2021 and another $4,949 on August 25, 2021, for a total of $17,633.

44.    Defendant represented to Laurie Jacobs and David Jacobs that the drawings for their order would be available in November of 2021 and that the building would arrive shortly thereafter.

45.    Prior to contracting, Defendant's Lorelle represented to Laurie Jacobs and David Jacobs that cancellation of feature additions were refundable at 50%.

## JARED MARTINEZ

46.    Plaintiff Jared Martinez is a citizen of Broomfield, Colorado.

47.    Jared Martinez first contacted Defendant in April of 2021 to obtain quotes for a building for property he and his wife Lindsey were going to purchase.

48.    After discussions with Defendant's Mike Gochenour regarding finding something that met Jared Martinez's needs and budget, Jared contracted with Defendant on May 27, 2021.

49.    On June 1, 2021, Jared Martinez paid an initial deposit of $8,000.

50.    After an upgrade on the thickness of the roof and upgraded color, Jared Martinez paid an additional $1,780 for said change order(s), for a total of $9,780 paid to Defendant.

51.    Defendant's Mike Gochenour then communicated to Jared Martinez that Defendant was booked out for drawings until October of 2021 and for November of 2021 for building deliveries.

52.    After Jared Martinez contracted with Defendant he was contacted by Defendant's Project Manager Alexandra Claudio.

53.    On June 24, 2021, Alexandra Claudio informed Jared Martinez that he was now "looking at about 14 weeks to complete drawings", making the drawings delivered around the end of September of 2021.

54.    The delivery of drawings has yet to happen.

55.     Jared Martinez then requested a refund from Defendant multiple times with Defendant denying those requests.

56.     On December 1, 2021 Defendant's Alexandra Claudio represented to Jared Martinez that "we were finally able to contract a structural engineering firm to assist with getting drawings out sooner" and estimated drawings to be delivered "in a month or so" but "it could be certainly sooner as well!"

57.     Jared Martinez still has not even received the building drawings from Defendant.

## SHELLY RICHARDSON AND LOUIS RICHARDSON

58.     Shelly and Louis Richardson are citizens of Colorado Springs, Colorado.

59.     In January 2021, the Richardsons sent plans to Defendant for an estimate.

60.     On January 27, 2021, the Richardsons received an estimate from Defendant, along with a proposed contract. The original cost of the project was $107,225.

61.     The Sales Representative Cathy, an agent of Defendant, stated that if the deposit was paid immediately, it would lock in the estimate and there would be no increases to total project costs.

62.     Defendant estimated that the time to get the steel would be approximately 16 weeks.

63.     After several months of no updates, the Richardsons went to Defendant's office to find out the status. They were told that the permit drawings would be completed within two weeks, but the price had gone up significantly to $172,225 ($65,000 more than the original).

64.     The Richardsons explained they paid their deposit to lock in the price, but were told that COVID necessitated implementation of the force majeure clause of the contract.

65.     In November 2021, the price rose again to $256,000.

66.    Upon information and belief, Defendant just recently issued the Richardsons a refund for the purpose of minimizing its damages in this case.

## MICHAEL GILLIS AND LILY FAIRCHILD

67.    Michael Gillis and Lily Fairchild are citizens of Lake George, Colorado.

68.    Plaintiffs and Defendant entered into a contract in March 18, 2021 for a metal building at a cost of $17,828.00.

69.    Plaintiffs placed a deposit of $8,700.

70.    When speaking with Defendant's salesman Ryan White, an agent/employee of Defendant, Mr. White stated that Plaintiffs should get delivery of the building in July 2021 or early August 2021 at the latest.

71.    Mr. White indicated that Defendant's prices would be going up due to rising steel prices, but that Plaintiffs could lock in their price by paying the deposit.

72.    Within a week after talking to Mr. White, project manager Lorelle Porter, an agent/employee of Defendant, stated that their sales had been breaking records and that they would receive permit drawings in 8-10 weeks and then the building itself in September or October 2021.

73.    Plaintiffs did not receive their drawings until January 6, 2022 which was nine months later than promised.

74.    Defendant also attempted to charge Plaintiffs $52,369.03 based on minor changes made to the plans.

75.    Plaintiffs submitted a demand letter to Defendant, who stated that all correspondence needs to go through their law office.

## JOEL AND KENDRA HARRY

76.    Joel and Kendra Harry are citizens of Parker, Colorado.

77.     Plaintiffs were told that if they signed a contract with Defendant by July 31, 2021 that they would lock in their price before the prices went up on August 1, 2021.

78.     Plaintiffs signed a contract at the time and paid a $13,600 down payment for 25% of the building cost.

79.     Plaintiffs were told at that time that they would have a building delivered by February 2022.

80.     Plaintiffs paid an additional $10,8000 after going through their designs for a 50% deposit on insulation.

81.     Plaintiffs still have not received their building, or even any set of drawings.

82.     Since October 2021, when it became clear that Defendant could not even produce a set of drawings, Plaintiffs have sought refunds on their deposits.

83.     Plaintiffs were told no refunds would be given.

84.     Plaintiffs were also told that price increases were due to an "act of God," namely COVID, even though COVID had been around for 18 months when Plaintiffs signed the contract.

85.     Defendant has told Plaintiffs that because they signed a contract, they will be forced to take possession of the building, no matter what the price increase.

**FLORIDA CITIZENS ROBERT AND SHELLEY BALDAUFF, MICHAEL J. KEY, AND LIZ TORRES**

**ROBERT BALDAUFF AND SHELLEY BALDAUFF**

86.     Plaintiffs Robert Baldauff and Shelley Baldauff are both citizens of Pace, Florida.

87.     Plaintiffs Robert Baldauff and Shelley Baldauff originally contracted with Defendant on February 27, 2021 after receiving the Defendant's proposed contract on February 25, 2021.

88.     Plaintiffs Robert Baldauff and Shelley Baldauff paid an initial deposit of $9,306.00 to Defendant and have paid Defendant a total amount of $37,306.00 to date.

89.     On January 12, 2022 Defendant's Vice President Brooke Gerhardt called Plaintiffs Robert Baldauff and Shelley Baldauff and stated that they needed to pay Defendant an additional $158,948.97.

90.     Brooke Gerhardt followed up with an email to Plaintiffs Robert Baldauff and Shelley Baldauff on January 14, 2022 and advised Plaintiffs Robert Baldauff and Shelley Baldauff of three options:

    a. Defendant can put the project on hold and wait for prices to come back down.

    b. Plaintiffs can accept your increase and Defendant could see if it has any more room to work with Plaintiffs on the amount, and Defendant could keep Plaintiffs on track to get the building hopefully next month.

    c. If Plaintiffs choose to cancel Defendant will waive any additional cancellation fees but all deposits paid are non refundable.

91.     The building was initially supposed to be delivered by July 2021.

92.     Electronic copies of the drawings were finally received by Plaintiffs Robert Baldauff and Shelley Baldauff on December 10, 2021.

93.     Hard copies were received by Plaintiffs Robert Baldauff and Shelley Baldauff December 24, 2021. They were completely useless since only one copy was completely signed.

94.     On information and belief, Armstrong knew all along that Plaintiffs Robert Baldauff and Shelley Baldauff's county required three stamped and signed copies.

11

95.    When Plaintiffs Robert Baldauff and Shelley Baldauff contacted Defendant about this issue, Defendant's Lorelle Porter responded: "We only stamp one full set."

### MICHAEL J. KEY

96.    Plaintiff Michael J. Key is a citizen of St. Augustine, Florida 32092.

97.    Michael Key first contracted with Defendant on May 4, 2021 and paid Defendant a deposit of $16,852.00 on May 14, 2021.

98.    Michael Key paid Defendant an additional $11,065 on June 10, 2021.

99.    Michael Key tried to discuss the status of his drawings and building many times, beginning three weeks after first paying Defendant and attempted to obtain engineering drawings from Defendant beginning on July 4, 2021.

100.    Defendant then began changing the dates for delivery starting at three weeks (salesman Jim Christopherson), then six to eight weeks (project manager Alexandra Claudio), then eight to sixteen weeks, then December 2021, then January 2022, then the end of February 2022.

101.    Michael Key's last contact with Defendant was with Defendant's Brooke G. on March 2, 2022.

102.    Prior to contracting, Defendant's agents told Michael things such as "put you at the front of the line for engineering", "3 weeks to get engineering back to you for final approval & build".

103.    Defendants agents Allie and Brooke tried to use Covid, steel availability, etc. as excuses for engineering, but engineering the structure has nothing to do with material availability until time to order and build with finalized and approved engineering package.

104.    Defendant's agent told Michael Key in December, 2021 that they had hired contract engineering to assist and hoped to beat the Feb. 2022 date as Michael Key's was project number 127 out of approximately 200.

105.    Defendant would not provide any schedule for Michael Key's project after he requested MS Project or similar, claiming it would reveal other customer data.

106.    Michael Key knew that was false as he is a registered professional engineer and deals with schedules daily.

107.    Defendant's Brooke G. agreed in December, 2021 that Allie needed to communicate better with Michael Key; however, to date, virtually every update and contact has been initiated by him, never by Defendant and never in writing.

## LIZ TORRES

108.    Plaintiff Liz Torres is a citizen of Osprey, Florida.

109.    Liz Torres first contracted with Defendant on March 2, 2021.

110.    As part of this transaction, Liz Torres paid Defendant a deposit of $14,200 on an original contract price of $56,280.

111.    In the end Liz Torres ended up paying Defendant $86,280.

112.    Defendant represented Liz Torres' building would be delivered by early May of 2021. It was not delivered at this time.

## IDAHO RESIDENT ADAM MACKE

113.     Adam C. Macke is a citizen of Lewiston, Idaho.

114.    Adam Macke first contracted with Defendant on or about February 26, 2021.

115.    As part of this transaction, Adam Macke paid Defendant a deposit of $7,384.

116.    Adam Macke paid Defendant an additional $3,621 on March 25, 2021.

117.    In October of 2021 Defendant represented to Adam Macke that he would now be responsible for all material price increases and any delays since he could not take delivery during the winter due to snowfall.

118.    Defendant finally delivered drawings to Adam Macke on January 4, 2022.

119.    Defendant would not give Adam Macke a final price until he signed off on said drawings.

120.    Adam Macke refused and requested a commitment to the original price or a full reimbursement.

121.    Defendant ignored Mr. Macke's and his lawyer's aforementioned requests.

122.    Defendant falsely represented Adam Macke's building would be delivered by first week of June, 2021.

123.    Adam Macke tore down a perfectly good shop to make for the alleged delivery of the Armstrong product, costing Adam all of his storage space since May of 2021.

## IOWA RESIDENT SCHUYLER JOSEPH VREEMAN

124.    Plaintiff Schuyler Joseph Vreeman is a citizen of Sheldon, Iowa.

125.    Schuyler Vreeman first contracted with Defendant on or about February 17, 2021.

126.    Before agreeing to the terms therein, Defendant's Alex Searls promised Schuyler Vreeman that the contracted for "rebated price" would be honored even if there were delays by Defendant in production and/or delivery.

127.    As part of that agreement, Schuyler Vreeman paid Defendant $7,171.

128.    On February 25, 2021, Defendant's Project Manager Lorelle Porter represented to Schuyler Vreeman that "You will be receiving a discount on the retail prices listed in the catalog,

so you will be looking at the Dealer Cost. **To remain qualified for your rebate, we need to finalize the design of your building within 30 days of your purchase. That date is 3/19/2021**."

129.    Shortly thereafter, and on February 26, 2021, Schuyler Vreeman paid Defendant an additional $62.50 to Defendant for a change order relating to some bracing in the proposed building.

130.    On or about April 22, 2021, Schuyler Vreeman inquired on the status of her drawings.

131.    In response, Defendant's Project Manager Lorelle Porter stated to Schuyler Vreeman that:

> "You're #21 in the queue.
> I still cannot give a time frame though. We have 180 files waiting for Permits as we have had record-breaking months in the last 5 months.
> I promise you, as soon as they are done, I'll email them to you.
> Thank you for your patience."

132.    On April 22, 2021, Defendant's Project Manager Lorelle Porter represented to Schuyler Vreeman that Defendant "sold 100 buildings in March – never ever been done before in the history of Armstrong. CRAZY".

133.    On July 7, 2021, Schuyler Vreeman emailed Defendant's Project Manager Lorelle Porter and inquired upon the status of the building.

134.    Shortly thereafter, Defendant's Project Manager Lorelle Porter acknowledged "They still aren't done. Thanks for your patience. I promise you, as soon as they hit my inbox I'll email them to you.

135.    On or about August 26, 2021, Defendant's Project Manager Lorelle Porter finally tendered Schuyler Vreeman "the electronic version of the Permit Drawings."

136.    On or about October 21, 2021, Defendant first requested additional money from Schuyler Vreeman despite the prior representation(s) to the contrary.

137.    Specifically, Schuyler Vreeman got a call from Defendant's Brooke just days before Schuyler intended to begin pouring concrete for her building that the cost of said building was going to more than double in price, from approximately $28,000 to approximately $57,000.

138.    Defendant, through Brooke, further stated that no refund would be offered.

139.    Schuyler Vreeman decided to have a local Iowa company build a wood based post frame building as an alternative.

## <u>KENTUCKY CITIZENS BRANDON AND JENICA ANDERSON</u>

140.    Brandon Anderson and Jenica Anderson are citizens of Lancaster, Kentucky.

141.    Brandon Anderson entered into a contract with Defendant on February 1, 2021 for a 30'x80' shell of a building for the total cost $24,824.00.

142.    Brandon Anderson made a first deposit to Defendant on February 4, 2021 in the amount of $6,206.00.

143.    On March 5, 2021 Brandon Anderson and Defendant entered into a revised contract at a cost of $42,769.29 due the addition of window and door openings.

144.    Brandon Anderson made a second direct deposit for these changes in the amount of $8,987.00 on March 5, 2021.

145.    Defendant verbally advised Brandon Anderson and his wife that their building would be delivered within 90 days of their second deposit, which would have been June 5, 2021.

146.    Defendant then was silent until November 2021 when Brandon Anderson finally received preliminary drawings and he signed off on those.

147.    Defendant then told Brandon Anderson in an email by Defendant's project manager that Brandon Anderson's building would be delivered the first of 2022.

148.    On January 24, 2022, Defendant's Vice President Brooke Gerhardt called Brandon Anderson and informed him of a price increase and said to obtain performance by Defendant he would have to sign a new contract.

149.    Defendant's Vice President Brooke Gerhardt emailed the new contract to Brandon Anderson's wife Jenica Anderson's email where a "MISC Steel Price Increase" of $52,797.08 was added to Brandon Anderson's original contract making the grand total for their building order $94,722.08.

150.    Brandon and Jenica Anderson havae refused to sign the new contract and have refused to pay any additional price increases.

151.    Rather, Jenica Anderson has told Defendant's Brooke Gerhardt in writing that her and Brandon Anderson either wanted their original contract held up on their end or they wanted their deposits back.

152.    Defendant's Brooke Gerhardt responded in March of 2022 and said that "Plaintiffs agreed to pay price increases when they signed the original contract because it was in the terms and conditions."

## MISSOURI CITIZEN CHRISTOPHER J. WHITEHILL

153.    Plaintiff Christopher J. Whitehill is a citizen of Independence, Missouri.

154.    Defendant represented to Mr. Whitehill that if he purchased his Armstrong building at that time it would "lock" in his price because of the tonnage of metal they had just purchased at that price and that if he waited to sign the contract the metal price would go up.

155.    That turned out to not be true.

156.    Defendant then represented that Mr. Whitehill would have stamped drawings ready to submit for permits in 6 to 8 weeks.

157.    It has now been almost a year and Mr. Whitehill just recently received drawings from Defendant.

158.    In the process of waiting Mr. Whitehill's wife had many conversations with the Defendant's Vice President Brooke Gerhardt.

159.    In one of those she stated that when the pandemic started and everything was shut down they had a year's worth of business on the books and then in March of 2021 when business started back they knew they had "a year's worth of business in the books".

160.    However, Defendant took Mr. Whitehill's money in April 1, 2021 and told him it would take 6 to 8 weeks to get drawings and 3 to 4 additions weeks to get his building.

161.    As part of this transaction, Mr. Whitehill paid $16,500.00 to Defendant.

162.    Mr. Whitehill has requested a refund but Defendant has refused, and has rather, asked for more money from him and his wife, Susan Whitehill in order to complete his order.

### **MICHIGAN CITIZEN CHARLES GIBSON**

163.    Plaintiff Charles Gibson is a citizen of Sparta, Michigan.

164.    During the first conversation Charles Gibson had with Defendant on January 25, 2021, Defendant's Brian Schmidt represented to Mr. Gibson that he could lock him in at 2020 pricing if he put his deposit down by January 26, 2021.

165.    Charles Gibson first contracted with Defendant on January 25, 2021, after first speaking with Defendant's Brian Schmidt.

166.    Defendant's Brian Schmidt assured Charles Gibson that it would be a six to eight delivery and that Mr. Gibson would have drawings of the product within two to three weeks.

167.    Defendant's Brian Schmidt further represented that everything he needed was included, with the exception of doors and windows.

168.    Later, Defendant's Brian Schmidt failed to place windows and doors where Charles Gibson requested.

169.    In response, Defendant's Brian Schmidt responded that the project manager would correct the issue at no additional cost.

170.    Charles Gibson was interested in Defendant's marketing regarding the warranty offered and that the product was Made-in-America.

171.    Charles Gibson ordered a 40'x60'x20' structure from Defendant at a quoted price of $35,235.00.

172.    Charles Gibson added change orders on February 23, 2021 and obtained a Final Design Acknowledgment that day.

173.    Charles Gibson first learned of Defendant's alleged "Terms and Conditions" on August 10, 2021 following a conversation with his and Defendant's employee/agent and project manager Allie.

174.    Defendant's Allie first mentioned a price increase to Charles Gibson once the product was out of engineering, but did not provide Mr. Gibson any details.

175.    Charles Gibson gave a deposit of $8,810.00 to Defendant on January 26, 2021 and another $2,005.00 on February 23, 2021.

176.    Charles Gibson complained to Defendant on April 14, 2021.

177.    Charles Gibson emailed Defendant's VP Kade Koenig regarding the status of his drawings.

178.    On January 27, 2021, Charles Gibson requested that his monies be refunded to no avail.

179.    Defendant's Vice President Brooke Gerhardt responded to Charles Gibson's request stating that there could be no refunds as they already started his project in multiple departments.

180.    Charles Gibson and his family have been paying in-laws rent to stay with them and has storage units full of supplies and material for the project and his forthcoming residence.

181.    Charles Gibson prepared his land for construction, which will have to be performed again.

182.    The permits Charles Gibson will have to be pulled again.

## <u>MONTANA CITIZEN GARY VINOVICH</u>

183.    Plaintiff Gary Vinovich is a citizen of Rexford, Montana.

184.    Gary Vinovich first contracted with Defendant in March of 2021.

185.    Initially, Gary Vinovich was working with Defendant's "Building Consultant" Chas Herrin.

186.    Defendant, through Chas Herrin, falsely represented in what appears to be a form and/or uniform email on March 11, 2021 that Armstrong Steel was "currently delivering buildings in about 120 days from purchase.

187.    Defendant, through Chas Herrin, also falsely represented on March 11, 2021 that Armstrong Steel "will take a 25% deposit to secure your pricing and tag the amount of steel used for your building in your name.

188.    Gary Vinovich subsequently ordered a 50' x 30' x 14' all steel garage from Defendant for the original price of $25,717.

189.     As part of this initial transaction, Gary Vinovich paid a $6,500 deposit.

190.     On April 13, 2021, Gary Vinovich paid another $4,290 to Defendant.

191.     In consideration for these payments, Gary Vinovich expected delivery in 120 days.

192.     Since April 13, 2021, Defendant has not contacted Gary Vinovich.

193.     When Gary Vinovich managed to get through to anyone working for Defendant he was told he was "in the Engineering Queue".

194.     Gary Vinovich requested a refund from Defendant on August 10, 2021.

195.     Gary Vinovich was falsely promised a "Price-Lock" from Defendant that was accompanied with a "When we get your deposit, you lock in the price."

## TEXAS CITIZENS DAN MERCER, ROGER APPLEWHITE, AND HEDIEH POURNIK

### DAN MERCER

196.     Plaintiff Dan Mercer was a citizen of Canyon, Texas.

197.     Dan Mercer contracted with Defendant on February 26, 2021 for a 50'x80'x12' building for a total of $66,535.03.

198.     As part of this transaction, Dan Mercer paid Defendant a deposit of $7,704 initially and an additional $17,860.50 thereafter for a total of $25,564.50.

199.     Dan Mercer placed a change order with Defendant on March 12, 2021.

200.     In mid-July of 2021, Dan Mercer began asking Defendant for drawings and for a cancellation.

201.     Dan Mercer received a final design acknowledgment and stamped drawings in early August, 2021.

202.     Defendant then told him he should receive his building in October of 2021.

203.    Defendant contacted Dan Mercer about a price increase for the first time on October 15, 2021 and said that Defendant was about to start his building.

204.    Defendant told Dan Mercer that his price increased on October 15, 2021 to $74,360.

205.    Dan Mercer politely told Defendant that he would not pay any more for the building considering he had a set price he and Defendant had already agreed to.

206.    On Tuesday, October 19, 2021, Defendant contacted Dan Mercer and said they had talked to the owner and he had agreed to an increase of just $49,573.68, making Dan's initial purchase of $66,535.83 grow to $115,700.49.

207.    Defendant has still failed to deliver any product to Dan Mercer.

208.    Dan Mercer has demanded his money back.

209.    Defendant agreed to refund some of Dan Mercer's money on June 18, 2021 but Dan responded that he would not accept anything less than a full refund.

210.    Dan Mercer made a complaint to the Better Business Bureau in July, 2021.

**ROGER APPLEWHITE AND HEDIEH POURNIK**

211.    Roger Applewhite and Hedieh Pournik are citizens of Cypress, Texas.

212.    Mr. Applewhite and Ms. Pournik signed a contract with Defendant on October 30, 2020 and placed a $48,000 deposit at that time.

213.    Mr. Applewhite and Ms. Pournik were worried about their budget, but Cathy Holland, the Director of Commercial Sales for Defendant and an agent/employee of Defendant, said that she would lock in their pricing with the payment of that $48,000 deposit.

214.    Ms. Holland also recommened the builder, Luis Taipe, who Mr. Applewhite and Ms. Pournik ultimately went with on the project.

215.    Mr. Applewhite and Ms. Pournik received initial approval of the drawings on
November 19, 2020 and saw a couple of mistakes. She submitted several other changes for
budgeting reasons, but was previously assured that there was no rush and she would be able to
make changes.

216.    On January 20, 2021, Ms. Holland informed Mr. Applewhite and Ms. Pournik that
"Based on the amount of changes we will need to send you another full set of approval drawings
with the changes incorporated prior to sending you a set of stamped final permit drawings."

217.    Defendant greatly decreased communication and that point and the dates given for
completion of tasks would never be met.

218.    On November 23, 2021, Defendant's Senior Vice President, Brooke Gerhardt,
stated that in order for Defendant to produce the steel for Mr. Applewhite and Ms. Pournik project,
they would have to come up with an additional $307,000. Defendant claimed, for the first time,
that their *force majeure* clause allowed this.

219.    Ms. Gerhardt gave Mr. Applewhite and Ms. Pournik three options: (1) continue on
and pay the $307,000; (2) shelve the project and wait for the prices to come down, or (3) walk
away and forfeit the $48,000 deposit.

220.    At this time, Mr. Applewhite and Ms. Pournik had already moved forward with
their builder and paid for foundation engineering, architectural design services, pad work such as
tree removal, fence, culvert, and water well installation, septic design services, temporary electrical
pole service, and meetings.

## UTAH CITIZEN KURT W. WITHERS

221.    Plaintiff Kurt W. Withers is a citizen of South Jordan, Utah.

222.    Defendant's Building Consultant Mike Daugherty falsely represented to Kurt Withers on February 25, 2021 that the "timeframe from down payment to steel on the ground is about 3-4 months right now.

223.    Plaintiff Kurt Withers first contracted with Defendant on February 26, 2021.

224.    Defendant initially quoted Kurt Withers a building delivery date of June, 2021 at a "discounted building price" of $24,565 after a "rebate" of $4,913.

225.    Defendant's Mike Daugherty falsely represented to Kurt Withers on February 25, 2021 that the "timeframe from down payment to steel on the ground is about 3-4 months right now."

226.    As part of that, Kurt Withers paid Defendant a deposit of $6,142.

227.    Kurt Withers then paid Defendant an additional deposit of $8,010 per Defendant's request on March 24, 2021 following a total change order of $14,925.77.

228.    On March 25, 2021, Defendant's Project Manager Lorelle Porter falsely represented to Plaintiff that permit drawings were currently "taking anywhere from 6-8 weeks for you to receive the PDF version."

229.    Approximately a year later, specifically on February 3, 2022, Defendant requested an additional $42,000 from Kurt Withers.

230.    Defendant then sent Kurt Withers an email the next day, February 4, 2022, requesting an additional $28,508.16, which allegedly was the best and final offer Defendant would make Kurt.

## WASHINGTON CITIZENS LINETE APARACIO-CHAGOLLA AND ADAM J. CHENEY

### LINETE APARICIO-CHAGOLLA

231.    Plaintiff Linette Aparicio-Chagolla is a citizen of Winlock, Washington.

232.    Linette Aparicio-Chagolla first contracted with Defendant on March 26, 2021.

233.    As part of that, Linette Aparicio-Chagolla paid Defendant a deposit of $8,690.00.

234.    Defendant represented to Linette Aparicio-Chagolla that her building was to be delivered within 8-12 weeks of the March 26, 2021 contract date.

235.    That did not happen.

236.    Rather, on January 10, 2022, Linette Aparicio-Chagolla was contacted by Defendant and was told her order was placed on the production calendar and would receive her building in approximately four weeks.

237.    Defendant's Brook Gerhardt then called Linette Aparicio-Chagolla on February 8, 2022 and said the price had now increased.

238.    On or about February 8, 2022, Defendant demanded that Linette Aparicio-Chagolla pay additional money to Defendant in order to have the original contract honored.

### ADAM CHENEY

239.    Adam J. Cheney is a citizen of Port Orchard, Washington 98367.

240.    On April 27, 2021, Defendant contacted Adam Cheney via email after he requested a quote from Defendant's website providing a link to see all their five star reviews on their web page.

241.    Adam Cheney ignored the email.

242.    On May 3, 2021, Adam Cheney received an email from Defendant saying they were waiting for Adam to tell them about his project.

243.    Adam replied "I never received a quote from you guys. I requested one, nothing happened after. If it's over 45k, I'm not interested."

244.    On May 5, 2021, Adam Cheney received a call from Defendant's agent and/or employee Alex Searls.

245.    Alex Searls pitched the structure base quote and offered a rebate but stated that Adam Cheney had to sign up within a timeframe in order to lock in the product.

246.    Adam Cheney then asked if there's a chance they will change the price on him when the material is on the truck halfway here and Alex Searls replied "I've never heard of that happening at all".

247.    Adam Cheney then reviewed the Defendant's Docusign documents and completed the forms.

248.    On May 15, 2021, Adam Cheney received an email from was Defendant's Trish Trevino/ Scully informing Mr. Cheney that she was his project manager and sent him a catalog for outfitting the bare steel structure with the notice he had 30 days to complete.

249.    Adam Cheney then filled out the Defendant's forms.

250.    On May 20, 2021 Adam Cheney received the final purchase agreement for the structure with a side note from Trish Trevino saying "Don't forget to initial above the signature space" which was referring to Armstrong's terms and conditions.

251.    During Mr. Cheney's review prior to signing, he went on Armstrong.com and searched their glossary of terms which explained the terms and nomenclature to describe the specific items used in constructing a steel building and it did not seem there was anything to be alarmed about.

252.    Mr. Cheney then initialed and signed the document.

253.    On May 24, 2021, Adam Cheney emailed Defendant's Trish Trevino asking what the next step was.

254.    Defendant's Trish Trevino then called Mr. Cheney and told him that it will take up to twelve weeks to get the drawings and she will forward them to Mr. Cheney as soon as she got them.

255.    On June 16, 2021, Adam Cheney emailed Defendant's Trish Trevino for an update.

256.    On July 6, 2021, Adam Cheney called Defendant's Trish Trevino for a status update, but had to leave a voicemail.

257.    On July 7, 2021, Adam Cheney received an email from Defendant's Lorell Porter explaining that Trish was on leave and subsequently provided an excuse on why Mr. Cheney's drawings would now take up to 4-6 months.

258.    Following this email, Defendant's Lorelle Porter stopped responding to Adam Cheney.

259.    From August 17, 2021 to December 9, 2021, Defendant's Jordan Hale contacted Adam Cheney to let him know that she would be his point of contact and provided him information on where he was in the waiting line.

260.    On December 9, 2021, Adam Cheney requested a refund due to Armstrong not providing he what he paid for.

261.    On December 10, 2021, Jordan Hale provided a copy and paste response to Mr. Cheney's refund request(s).

262.    In January of 2022, Adam Cheney was put into contact with Armstrong's Brooke Gerhardt who called to tell Adam Cheney that they can circumvent the waiting queue for the drawings that they typically charge a fee for but they will waive the fee IF he signed an "expedited forms agreement" which was actually a gag order.

263.    Adam Cheney declined via email "I cannot sign this document as written."

264.    Adam Cheney received no response to this aforementioned email.

265.    On January 10, 2022, Adam Cheney reported Defendant to the Better Business
Bureau.

266.    On January 18, 2022, Adam Cheney filed a complaint regarding Defendant with
the Washington State Attorney General's Office.

267.    On March 1, 2022, Defendant's Brooke Gerhardt offered a refund if Adam Cheney
signed an agreement requiring Adam's non-disclosure and non-disparagement.

268.    From March 23-28, 2022, Defendant's Brooke Gerhardt accused Adam Cheney of
defamation by looking for other victims and posting factual reviews about my experience with
them.

269.    Adam Cheney has yet to receive anything of viable use from Defendant.

270.    Despite all of the aforementioned, Defendant still has Adam Cheney's location
pinned on their website map as a "Armstrong Building Customer".

271.    Adam Cheney's building permit is expired and gone, the money paid in inspections
and preparation for his building is completely wasted, and now investors and clients that wanted
to participate in my craft are gone and he is left with nothing except a deposit he is paying interest
on.

## CLASS ACTION ALLEGATIONS

272.    Plaintiffs, on behalf of themselves and the proposed Class, hereby reallege the
previous paragraphs  as if fully set forth herein.

273.    Plaintiffs, in accordance with, and pursuant to, Rule 23 of the Federal Rules of Civil Procedure, brings this action on behalf of themselves and on behalf a Nationwide Class of similarly-situated individuals, defined as follows:

> *All persons and other entities who purchased one or more steel buildings from Atlantic Building Systems, LLC d/b/a Armstrong Steel Corporation and either (1) have not yet received their steel building; (2) were charged additional rates not agreed to by contract on or after May 5, 2017; or (3) received their steel building in an untimely manner on or after May 5, 2017.*

274.    Class Period: The class period is May 5, 2017 to present.

275.    Exclusions: Excluded from the Nationwide Class are:

(a) Any judge presiding over this action and the family members of any judge presiding over this action.

(b) Defendant, its subsidiaries, its parents, its successors, its predecessors, any other entity in which Defendant or its parents have a controlling interest, and current or former offices and directors of Defendant, its subsidiaries, its parents, its successors, its predecessors, any other entity in which Defendant or its parents have a controlling interest;

(c) Employees who have had a managerial responsibility on behalf of Defendant, whose act or omission in this matter may be imputed to Defendant for purposes of civil or criminal liability, or whose statement may constitute an admission on the part of Defendant;

(d) The attorneys working on Plaintiff's claims;

(e) Legal representatives, successors, or assigns of any such excluded persons.

276.    Numerosity: Upon information and belief, Defendant has widely marketed its products nationwide. The Nationwide Class Members include thousands of consumers.

277. Common Questions of Law or Fact: There are numerous questions of law or fact common to the Class, including, but not limited to:

(a) Whether Defendant breached its contracts with the Nationwide Class Members;

(b) Whether Defendant breached its duty of good faith and fair dealing;

(c) Whether Defendant was prepared and able to supply its products to the consuming public;

(d) Whether Defendant advertised that it was prepared and able to supply its products to the consuming public.

278. Typicality. A class action is appropriate because Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs paid for a steel buildings that they never received and Defendant attempted to charge more than the price lock in the contract.

279. Adequacy of Class Representatives. Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Nationwide Class Members he seeks to represent. Plaintiffs have pledged to protect the interests of the Class and has been fairly chosen to do so.

280. Adequacy of Class Counsel. Plaintiffs' counsel has litigated and certified a substantial number of class action cases.

281. A class action is appropriate because the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual Class members and establish incompatible standards of conduct.

282. A class action is appropriate because Plaintiffs have acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

283.    A class action is appropriate in that questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

284.    Class treatment will conserve the resources of the courts and litigants, be mindful of the judicial economy, and promote efficient adjudication of the Nationwide Class Members' claims.

## COUNT I- BREACH OF CONTRACT

285.    Plaintiffs, on behalf of themselves and the Nationwide Class, hereby re-allege the previous paragraphs as if fully set forth herein.

286.    Plaintiffs and the Nationwide Class Members entered into Contracts with Defendant, whereby Plaintiffs and the Nationwide Class Members purchased one or more "Metal Building System(s)" from Defendant.

287.    The Contracts included a form Purchase Order and Terms and Conditions which are available on Defendant's website.

288.    In contracting with Plaintiffs and the Nationwide Class Members, Defendant contracted that its "Metal Building System(s)" would be timely delivered.

289.    In contracting with Plaintiffs and the Nationwide Class Members, Defendant indicated to Plaintiffs that their price would be locked in by payment of a deposit.

290.    Plaintiffs and the Nationwide Class Members fulfilled their contractual obligations by paying for, at least partially via a deposit, the steel buildings they expected to receive.

291.    Defendant breached its contracts with Plaintiffs and the Nationwide Class Members by accepting tender for its products, and then either not delivering the products as promised or

delivering the products in an untimely manner that deprived Plaintiffs and the Nationwide Class Members of the benefit of its bargain.

292.    Defendant breached its contracts with Plaintiffs and the Nationwide Class Members by not honored their "locked in" prices and continuing to charge Plaintiffs additional rates.

293.    Defendant received and retained payment from Plaintiffs and the Nationwide Class Members.

294.    Defendant was required to perform under the contracts, and nothing excused its performance or rendered its performance impossible.

295.    As a direct and proximate result of Defendant's breaches of contract, Plaintiffs and the Nationwide Class Members have been harmed by not receiving what they purchased under the Contract.

WHEREFORE, Plaintiffs pray on behalf of themselves and all other Nationwide Class Members for a judgment in favor of the Nationwide Class and against Defendant in an amount as is fair and reasonable; an award of reasonable attorneys' fees, costs, and expenses; pre- and post-judgment interest; injunctive relief as permitted by law and equity; and any other relief the Court deems just and proper.

### COUNT II- BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

296.    Plaintiffs, on behalf of themselves and the Nationwide Class, hereby re-allege the previous paragraphs as if fully set forth herein.

297.    Plaintiff and the Nationwide Class Members entered into Contracts with Defendant, whereby Plaintiffs and the Nationwide Class Members purchased "Metal Building System(s)" from Defendant.

298.    Every contract in Colorado contains an implied duty of good faith and fair dealing, which requires the parties to an agreement to perform their obligations in good faith and in a reasonable manner.

299.    In contracting with Plaintiffs and the Nationwide Class Members, Defendant had a duty to act in good faith and engage in fair dealing.

300.    Plaintiffs and the Nationwide Class Members anticipated that Defendants would honor Plaintiffs and the Nationwide Class Members' reasonable expectations as expressed in their agreements.

301.    The Contract gave Defendant discretionary authority in when it would deliver the steel buildings to Plaintiff and the Nationwide Class Members.

302.    By not delivering the "Metal Building System(s)" on time as promised, or at all, and by not having the ability to deliver the "Metal Building System(s)" on time when it accepted the orders of Plaintiffs and the Nationwide Class Members, Defendant breached its duty of good faith and fair dealing.

303.    Defendant used the discretion conferred by the contract to act dishonestly and to act outside the scope of accepted commercial practices, which deprived Plaintiffs and the Nationwide Class Members of the benefit of their contracts.

304.    Plaintiffs and the Nationwide Class Members were damaged by Defendant's breach of the implied covenant of good faith and fair dealing since they paid for "Metal Building System(s)" which were either never delivered or were not delivered in a timely fashion.

WHEREFORE, Plaintiffs prays on behalf of themselves and all other Nationwide Class Members for a judgment in favor of the Nationwide Class and against Defendant in an amount as is fair and reasonable; an award of reasonable attorneys' fees, costs, and expenses; pre- and post-

judgment interest; injunctive relief as permitted by law and equity; and any other relief the Court deems just and proper.

## COUNT III- UNJUST ENRICHMENT

305.    Plaintiffs, on behalf of themselves and the Nationwide Class, hereby re-allege the previous paragraphs as if fully set forth herein.

306.    Defendants received substantial benefits from Plaintiffs and the Nationwide Class Members when it received payments for the "Metal Building System(s)" it was supposed to deliver to Plaintiffs and the Nationwide Class Members.

307.    Defendant knowingly accepted the benefits that were conferred by Plaintiffs and the Nationwide Class Members.

308.    In either not delivering the "Metal Building System(s)" or delivering them in an untimely fashion, Defendant knew or should have known it was providing significantly less value than what Plaintiff and the Nationwide Class Members were expecting.

309.    In charging Plaintiffs significantly more for their "Metal Building System(s)" than the "locked in" price negotiated in the contract, Defendant knew or should have known it was providing significantly less value than what Plaintiffs and the Nationwide Class Members were expecting.

310.    It would be inequitable and unjust for Defendant not to reimburse or refund Plaintiffs and the Nationwide Class Members for the money Plaintiff and the Nationwide Class Members spent on steel buildings that they either never received or received in an untimely fashion.

311.    Plaintiffs and the Nationwide Class Members are entitled to restitution of the amounts wrongfully collected and improperly retained by Defendant.

312.    Plaintiffs and the Nationwide Class Members seek the institution of a constructive trust from which Plaintiffs and the Nationwide Class Members may seek restitution.

WHEREFORE, Plaintiffs prays on behalf of themselves and all other Nationwide Class Members for a judgment in favor of the Nationwide Class and against Defendant in an amount as is fair and reasonable; an award of reasonable attorneys' fees, costs, and expenses; pre- and post-judgment interest; injunctive relief as permitted by law and equity; and any other relief the Court deems just and proper.

### COUNT IV- VIOLATION OF THE UNFAIR PRACTICES ACT
### C.R.S. 6-2-114, Advertising goods not available

313.    Plaintiffs, on behalf of themselves and the Nationwide Class, hereby re-allege the previous paragraphs as if fully set forth herein.

314.    C.R.S. 6-2-114 makes it unlawful for any person, firm, or corporation engaged in business within the state of Colorado to advertise goods, wares, or merchandise which they are not prepared and able to supply to the consuming public in pursuance of such advertisement.

315.    Defendant is a corporation engaged in business within the state of Colorado.

316.    Defendant advertised its goods throughout Colorado and the nation.

317.    Defendant was neither prepared nor able to supply the "Metal Building System(s)" Plaintiffs and the Nationwide Class Members purchased.

318.    C.R.S. 6-2-111 allows any person, firm, private corporation, municipal corporation, public corporation, or trade association to maintain an action for the recovery of damages. This also allows Plaintiffs and the Nationwide Class Members to be entitled to recover from Defendant three times the amount of actual damages sustained.

319.    Plaintiffs and the Nationwide Class Members are persons as defined by C.R.S. 6-2-111.

320.    Plaintiffs and the Nationwide Class Members were damaged by Defendant advertising goods, wares, or merchandise that it was not prepared and able to supply to the consuming public.

WHEREFORE, Plaintiffs pray on behalf of themselves and all other Nationwide Class Members for a judgment in favor of the Nationwide Class and against Defendant in an amount as is fair and reasonable; triple damages as authorized by C.R.S. 6-2-111; an award of reasonable attorneys' fees, costs, and expenses; pre- and post-judgment interest; injunctive relief as permitted by law and equity; and any other relief the Court deems just and proper.

**COUNT VI- VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT**

321.    Plaintiffs, on behalf of themselves and the Nationwide Class, hereby re-allege the previous paragraphs as if fully set forth herein.

322.    C.R.S. 6-1-113, effective August 10, 2022, authorizes a class action if a person is an actual or potential customer of the defendant's goods, services, or property, and is injured as a result of such deceptive trade practice.

323.    C.R.S. 6-1-113(2.9), effective August 10, 2022, states that "in a case certified as a class action, a successful plaintiff may recover actual damages, injunctive relief allowed by law, and reasonable attorney fees and costs.

324.    C.R.S. 6-1-113, effective until August 10, 2022, allows injunctive relief to be sought and granted as a class action.

325.    Plaintiffs are "persons" as defined by C.R.S. 6-1-102.

326.    Defendant is a designer, manufacturer, promoter, marketer, developer, seller, and/or distributor of "Metal Building System(s)."

327. Defendant sold its "Metal Building System(s)" in Colorado and throughout the United States during the class period.

328. Defendant violated C.R.S. 6-1-105 when it:

(e) Either knowingly or recklessly made a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith;

(g) Represented that goods were of a particular standard, quality, or grade, or that goods are of a particular style or model, when it knew or should have know that they are of another;

(i) Advertised goods or services with the intent not to sell them as advertised;

**(j) Advertised goods or services with intent not to supply reasonably expectable public demand;**

**(l) Makes false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, or existence of, or amounts of price reductions;**

(n) Employs "bait and switch" advertising, which is advertising accompanied by an effort to sell goods, services, or property other than those advertised or on terms other than those advertised and which is also accompanied by one or more of the following practices:

(IV) Refusal to take orders for the goods, property, or services advertised for delivery within a reasonable time;

(VI)  Accepting a deposit for the goods, property, or services and subsequently switching the purchase order to higher-priced goods, property, or services; or

(VII)  Failure to make deliveries of the goods, property, or services within a reasonable time or to make a refund therefor;

(u) Failed to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information as intended to induce the consumer to enter into a transaction;

(kkk) Either knowingly or recklessly engaged in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice.

329.    Defendant had the intent to injure competitors and to destroy or substantially lessen competition.

330.    Defendant used deception, fraud, false pretense, misrepresentation or the concealment, suppression, or omission of material facts, either expressly or by implication, including, without limitation:

(e) Either knowingly or recklessly made a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith;

(g) Represented that goods were of a particular standard, quality, or grade, or that goods are of a particular style or model, when it knew or should have know that they are of another;

(i) Advertised goods or services with the intent not to sell them as advertised;

**(j)  Advertised goods or services with intent not to supply reasonably expectable public demand;**

**(l)  Made false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, or existence of, or amounts of price reductions;**

(n)  Employed "bait and switch" advertising, which is advertising accompanied by an effort to sell goods, services, or property other than those advertised or on terms other than those advertised and which is also accompanied by one or more of the following practices:

> (IV) Refusal to take orders for the goods, property, or services advertised for delivery within a reasonable time;

> (VI) Accepting a deposit for the goods, property, or services and subsequently switching the purchase order to higher-priced goods, property, or services; or

> (VII)  Failure to make deliveries of the goods, property, or services within a reasonable time or to make a refund therefor;

(u) Failed to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information as intended to induce the consumer to enter into a transaction;

(kkk) Either knowingly or recklessly engaged in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice.

331.    Contrary to these representations, the "Metal Building System(s)" Defendant sold were done so without the intent to supply reasonably expectable public demand. "Metal Building System(s)", if they were delivered, were also not of the price, standard, quality, or grade that Defendant represented they would be.

332.    Defendant did not have the intent to sell the "Metal Building System(s)" as advertised.

333.    Contrary to these representations, Defendant sold the "Metal Building System(s)" without the intent to honor the "locked in" price and demanded its customers pay significant, additional price increases before Defendant was willing to perform Defendant's portion of the contract and manufacture, supply and deliver the "Metal Building System(s)".

334.    Defendant had exclusive knowledge at the time it sold "Metal Building System(s)" to Plaintiffs and the Nationwide Class Members that it was not going to timely deliver the steel "Metal Building System(s)," that it would not honor the "locked in" price, and that the "Metal Building System(s)" were of an inferior quality.

335.    These representations were materially misleading and deceptive and were a producing cause of economic damages to customers.

336.    Defendant intentionally and knowingly used deception, false pretense, false promise, misrepresentation, and/or concealment of material facts regarding the "Metal Building System(s)" with the intent to mislead Plaintiff and the Nationwide Class Members.

337.    As a direct and proximate result of Defendant's deceptive and unfair practices, Plaintiffs and the Nationwide Class Members were induced to buy "Metal Building System(s)" that they otherwise would not have chosen to buy and suffered ascertainable losses and injuries in an amount to be subject to proof at trial.

WHEREFORE, Plaintiffs pray on behalf of themselves and all other Nationwide Class

Members for a judgment in favor of the Nationwide Class and against Defendant in an amount as

is fair and reasonable; an award of reasonable attorneys' fees, costs, and expenses; pre- and post-

judgment interest; injunctive relief as permitted by law and equity; and any other relief the Court

deems just and proper.

**PLAINTIFFS RESPECTFULLY REQUEST/DEMAND A TRIAL BY JURY ON ALL
COUNTS SO TRIABLE.**

Dated: May 5, 2022                                  Respectfully submitted,

|  | MCINNES LAW LLC<br>By: */s/ Jack McInnes*<br>Jack D. McInnes (Admitted in D. Colo. on<br>7/20/2009 and In Good Standing)<br>1900 West 75th Street, Suite 220<br>Prairie Village, Kansas 66208<br>Telephone: (913) 220-2488<br>Facsimile: (913) 347-7333<br>jack@mcinnes-law.com<br><br>A. Scott Waddell (MO #53900)<br>WADDELL LAW FIRM LLC<br>1900 West 75th Street, Suite 220<br>Prairie Village, Kansas 66208<br>Telephone: (816) 399-5510<br>Facsimile: (913) 347-7333<br>scott@aswlawfirm.com<br><br>ATTORNEYS FOR PLAINTIFFS |
|--|--|